2005-NMSC-015

113 P.3d 320

**TOM GROWNEY EQUIPMENT CO., Ace USA, Patterson Drilling, Clearnan Insurance Co., Big Dog Drilling and Highland Insurance Co., Employers–Insurers–Petitioners,**

v.

**James JOUETT, Worker–Respondent.**

Nos. 28,481, 28,482, 28,486.

Supreme Court of New Mexico.

May 20, 2005.

Hinkle, Hensley, Shanor & Martin, L.L.P., Thomas D. Haines, Jr., Mary Lynn Bogle, Roswell, NM, Miller Stratvert P.A., Timothy R. Briggs, Jennifer L. Stone, Sturges, Houston & Sexton, P.C., Paul L. Civerolo, Christina M. Bartosh, Albuquerque, NM, for Petitioners.

Max Houston Proctor, Hobbs, NM, for Respondent.

## OPINION

SERNA, Justice.

{1} This workers' compensation case involves the questions of whether an initial employer or subsequent employers are liable for disability and medical benefits for a non-disabling injury originally sustained during employment that was exacerbated by subsequent employment resulting in disability and whether the initial or subsequent employers can recover a proportionate share of the compensation amount from the other employers. James Jouett, the worker, appealed from the Workers' Compensation Judge's (WCJ) order denying his claims against three successive employers, Tom Growney Equipment Co. and its insurer, Ace USA (Growney Equipment), Patterson Drilling and its insurer, Clearnan Insurance Co. (Patterson Drilling), and Big Dog Drilling Co. and its insurer, Highland Insurance Co. (Big Dog). The Court of Appeals concluded that Jouett's first employer is liable for medical treatment and

for the period of temporary total disability. *Jouett v. Tom Growney Equip. Co.*, 2004–NMCA–023, ¶ 15, 135 N.M. 136, 85 P.3d 260. The Court also concluded that the first employer may seek contribution outside the workers' compensation system from the subsequent employers despite the fact that Jouett became disabled while working for a later employer and despite the exclusivity provisions of the Workers' Compensation Act. *Id.* ¶ 19. This Court granted the employers' petitions for writ of certiorari.

{2} We conclude that the Workers' Compensation Act provides the exclusive remedies for work-related injuries and that contribution outside the Act from subsequent employers to initial employers is not authorized by statute. We also conclude that the initial employer, Growney Equipment, is not liable for the period of temporary total disability caused by aggravation of the initial non-disabling injury related to the subsequent employment which occurred after Jouett's employment with Growney Equipment ended. We conclude that Big Dog, the employer at the time Jouett became disabled, is potentially liable for disability compensation where the initial non-disabling injury is aggravated by subsequent work-related activities resulting in disability, assuming compliance with the Act. We remand this case to the WCJ to determine whether, under an analysis of applicable law, Big Dog is liable for disability and medical compensation dependent on whether Jouett complied with the Act, as well as to consider whether Growney Equipment is responsible for some portion of Jouett's medical expenses related to the initial accidental injury. Thus, we reverse the Court of Appeals. We affirm the WCJ in part, reverse in part, and remand for further proceedings.

## I.  Facts and Background

{3} The parties stipulated that Jouett sustained an injury to his left shoulder while employed by Growney Equipment on January 9, 1999. Jouett received medical care from Dr. Steve Hood for this injury, described as muscular in origin, including medication, rest in a harness, massage, and range of motion exercises. Because he apparently "forgot," Jouett did not attend a scheduled follow-up appointment for this injury. The parties stipulated that Jouett had no lost time or disability as a result of this initial injury; thus, he received only medical benefits from Growney Equipment at the time of his initial injury. Jouett was not absent from work due to this injury, was not disabled, and continued working for Growney Equipment until May of 2000, when he left in order to earn a higher wage. The WCJ found that the initial injury arose out of and in the course of employment with Growney Equipment and that the employer had notice of the injury.

{4} Jouett described the difference between his work at Growney Equipment and his subsequent oil rig work and stated that his work on the rigs was more strenuous. From May 10 to May 23, 2000, approximately two weeks, Jouett was employed by Patterson Drilling. In regard to Patterson Drilling's employment application question regarding prior work injuries and claims, Jouett conceded that he failed to indicate on his application that he had a previous work-related injury. Jouett stated that he continued to be in a great deal of pain from the time he left Growney Equipment through his employment at Patterson Drilling. Jouett stated that he injured his shoulder "pulling a six-inch collar" in a work-related accident at Patterson Drilling when the tool pusher was running the rig and "came up too fast;" he claimed he told a driller, but Jouett admitted that he did not report the incident according to procedure or fill out the required accident report. Jouett stated that this work-related accident increased and worsened the pain in his shoulder, describing that "it felt like everything just came apart again" and it "popped and pulled." Jouett described two situations in which performing the requirements of the job, chipping paint and "tripping pipe" at Patterson Drilling, also aggravated his shoulder. Jouett did not seek medical attention for these incidents. A Patterson Drilling employee testified that employees sign a drilling report daily indicating whether they had accidents or injuries, and that Jouett never indicated any injury to his shoulder on these reports. The WCJ found

that Jouett did not give actual or written notice to Patterson Drilling regarding any work-related accident within fifteen days of its occurrence.

{5} Aside from some short absences, Jouett was employed by Big Dog from June 6, 2000, until December 14, 2001. Jouett claimed that he continued to have shoulder pain while working for Big Dog, stating that he wore his sling to relieve the pain. In response to a question regarding work incidents in which he injured his shoulder at Big Dog, Jouett described several situations in which he was performing his work duties tripping pipe, working derricks, and carrying 100 pound sacks, and agreed that these activities aggravated his shoulder. Jouett stipulated that, on April 7, 2001, he went to the emergency room and received treatment for his left shoulder, stating that he had injured himself while working on a drilling unit. Jouett received pain medication for this injury, and he was restricted from work until April 12. Jouett stated that he stopped working for Big Dog on May 5, 2001, to try to have his shoulder injury treated. He was examined by another doctor on May 10 and referred to Dr. Frank P. Maldonado, an orthopedic surgeon, for three visits beginning May 15, 2001, until May 31, 2001. Jouett did not give Big Dog notice of any specific injury or disability related to the incidents he described and did not request medical expenses from Big Dog at this time; instead, Jouett requested that Growney Equipment continue paying for medical expenses.

{6} In his medical history, Dr. Maldando recounted that Jouett received "appropriate" "non-operative treatment" for his initial injury from Dr. Hood. Regarding his May 15, 2001, examination of Jouett, Dr. Maldonado described his "muscle wasting or loss of muscle mass about the left shoulder," as well as "some atrophy of his left arm and forearm musculature and significant loss of motion in the left shoulder." Dr. Maldonado reviewed diagnostic radiographs taken on January 13, 1999, and May 10, 2001, noting that "[t]he left shoulder films were normal on the 1999 films, and on the 2001 films they were essentially normal except [for a possible] small osteophyte or bone spur," or abnormal growth off of bone, on the tip of his shoulder blade. He stated that a bone spur can be the result of a specific injury or the result of cumulative injury over time. Dr. Maldonado ordered two additional tests, an MRI and a electrical diagnostic test, which were both normal. Finally, he recommended an arthroscopic examination of Jouett's shoulder to determine whether the bone spur was causing an impingement and whether it could be corrected. He diagnosed Jouett's condition as "painful left shoulder" with an unknown cause, but attributed the condition and disability to the 1999 injury to a reasonable degree of medical probability. In Dr. Maldonado's opinion, Jouett never reached maximum medical improvement following the original injury. However, Dr. Maldonado based these opinions on two questions Dr. Maldonado asked Jouett: whether he had shoulder problems prior to the 1999 injury and whether he had any subsequent injuries, both of which Jouett answered in the negative. After being informed about Jouett's testimony regarding his working conditions and work-related injuries sustained while working for subsequent employers, Dr. Maldonado opined that these subsequent employment activities aggravated his initial injury. During his visits in May of 2001, Dr. Maldonado told Jouett that he was temporarily totally disabled, and he recommended that Jouett not return to work. Despite this recommendation, Jouett subsequently returned to work.

{7} In the summer of 2001, Jouett applied again to work at Big Dog. Jouett continued to work for Big Dog until December of 2001, with the exception of a few weeks in July of 2001, when he worked for Key Drilling. Jouett apparently performed all required duties of his work for Big Dog during this time. Big Dog's attorney, during Jouett's deposition, asked Jouett if he had a conversation with Mike Whitley, Big Dog's safety representative, in June of 2001 regarding his initial shoulder injury. Jouett stated that he told Whitley "what was going on" and that the work on the rig "wasn't helping," because he was about to go into court on this case. Suffering what he described as progressively worsening, severe pain while working for Big Dog, Jouett finally quit working in December

of 2001 because he was in too much pain due to his shoulder and could no longer do the work required. Jouett stated that he could no longer tolerate the pain because of his work in the oil fields and that it made his shoulder worse. All parties stipulated that Jouett's "last day of work at Big Dog Drilling was December 14, 2001[,] due to left shoulder pain."

{8} Growney Equipment refused to pay for the arthroscopic evaluation or further treatment, so Jouett then filed a claim against Growney Equipment on June 27, 2001. Growney Equipment responded that subsequent employment was instead responsible for Jouett's current condition. Jouett amended his complaint in September of 2001, adding subsequent employers Patterson Drilling and Big Dog. This complaint indicated that Jouett continued to work at Big Dog at the time the complaint was filed.

{9} A recommended resolution was filed in November of 2001, advising that Growney Equipment and Big Dog pay Jouett's benefits "at a rate of fifty percent each," and that Patterson Drilling be dismissed with prejudice. Big Dog and Growney Equipment rejected this recommended resolution. Following this rejection, Jouett filed his complaint against Growney Equipment, Patterson Drilling, and Big Dog on December 24, 2001. Although continuing to reflect that the date of the accident was January 9, 1999, this complaint, for the first time, indicated that December 14, 2001, was the "[f]irst date [Jouett] was unable to perform [his] job duties."

{10} The parties agreed that the contested issues in the case included whether Jouett's current shoulder condition is causally related back, to a reasonable medical probability, to the work accident of January 9, 1999, with Growney Equipment, or whether his condition is a factor of one or more subsequent work accidents, injuries or aggravations with Jouett's subsequent employers, Big Dog and Patterson Drilling, breaking the chain of causation with respect to the first employer. The parties also agreed that another contested issue is "[w]hether [Jouett] is entitled to disability benefits, medical care and attorney fees from any party."

{11} The WCJ entered an order in November of 2002, finding that Jouett continually aggravated his initial injury, sustained while working for Growney Equipment, when he worked for Patterson Drilling and Big Dog. He found that Jouett's work activities at Patterson Drilling and Big Dog "substantially exceeded the normal physical strains of daily life," and that the aggravation of his shoulder caused by these activities "constituted an independent intervening event breaking causation for the Growney accident." The WCJ concluded that Jouett had accidents while working for Patterson Drilling and Big Dog which arose out of and in the course of his employment with these employers and resulted in injury. The WCJ decided that Jouett's failure to give timely notice to Big Dog and Patterson Drilling constituted a complete defense, and thus denied Jouett's workers' compensation claims against Big Dog and Patterson. The WCJ decided that Jouett's activities at the subsequent employers constituted an independent intervening event which broke the chain of causation, resulting in the decision that Growney Equipment did not owe Jouett benefits.

{12} The Court of Appeals reversed the WCJ. *Jouett*, 2004–NMCA–023, ¶¶ 15, 18, 135 N.M. 136, 85 P.3d 260. The Court concluded that Growney Equipment was liable for both medical and disability benefits for the period of temporary total disability that began in December of 2001. *Id.* ¶ 15. The Court also held that Growney Equipment could seek contribution from the subsequent employers, Patterson Drilling and Big Dog. *Id.* ¶ 18. This contribution remedy was apparently not raised or briefed to the WCJ or the Court of Appeals. The Court of Appeals noted that it was addressing the contribution issue as a matter of judicial economy because it was likely to arise on remand. *Id.* ¶ 16.

## II. Discussion

{13} "On appeal from a compensation order, the whole record standard of review applies. Under that standard, we must consider all evidence bearing on the findings, favorable or unfavorable, to determine if there is substantial evidence to support the

result." *Garcia v. Mora Painting & Decorating*, 112 N.M. 596, 600, 817 P.2d 1238, 1242 (Ct.App.1991) (citation omitted). Findings of fact are reviewed for substantial evidence. "Where the testimony is conflicting, the issue on appeal is not whether there is evidence to support a contrary result, but rather whether the evidence supports the findings of the trier of fact." *Urioste v. Sideris*, 107 N.M. 733, 736, 764 P.2d 504, 507 (Ct.App.1988). "Appellate courts review matters of law *de novo*." *Hasse Contracting Co. v. KBK Fin., Inc.*, 1999–NMSC–023, ¶ 9, 127 N.M. 316, 980 P.2d 641. We review the WCJ's application of the law to the facts regarding liability for compensation, apportionment, and notice de novo.

## A. Proceedings Below

{14} Regarding Growney Equipment, the WCJ found that Jouett's work activities at his subsequent employers, arising out of and in the course of his employment, "substantially exceeded the normal physical strains of daily life," resulting in injury, and this aggravation of Jouett's initial injury "constituted an independent intervening event breaking causation for the Growney accident." The WCJ relied on *Aragon v. State Corrections Department*, 113 N.M. 176, 179, 824 P.2d 316, 319 (Ct.App.1991) for his decision. *Aragon* addressed a subsequent non-work-related accident which aggravated a work-related injury. *Id.*

> It is reasonable to say that an injury resulting from the concurrence of a preexisting injury and the normal movements of everyday life is a "direct and natural result" of the original injury. It strains the meaning of "natural and direct result," however, to say that the phrase encompasses a subsequent injury precipitated by a severe and uncommon trauma.

*Id.* at 181, 824 P.2d at 321. We believe that the WCJ relied on *Aragon* as an analogy or a basis for concluding that there is an insufficient causal relationship between Jouett's initial 1999 injury and his 2001 disability because of the aggravation of the injury sustained at subsequent workplaces. However, we agree with the Court of Appeals that reliance on *Aragon*, a case involving a subsequent non-industrial aggravation, is not particularly instructive to the present matter.

{15} The Court of Appeals concluded that Growney Equipment was liable for the workers' compensation claim for medical treatment as well as the period of temporary total disability that began on December 14, 2001. *Jouett*, 2004–NMCA–023, ¶ 1, 135 N.M. 136, 85 P.3d 260. We believe the authority relied upon does not support this conclusion.

{16} The Court of Appeals concluded that "[t]he employer at the time of the accidental injury remains responsible for medical and related treatment even if the original accidental injury is later aggravated when the worker returns to work," *Jouett*, 2004–NMCA–023, ¶ 10, 135 N.M. 136, 85 P.3d 260, relying on *McMains v. Aztec Well Service*, 119 N.M. 22, 888 P.2d 468 (Ct.App.1994). We believe that *McMains* does not support the determination that Growney Equipment is initially solely liable for compensation. In *McMains*, the worker suffered an initial injury to his lower back resulting in temporary total disability while working for his first employer, which resolved with medical treatment; he later suffered another work accident, injuring his lower back, while working for a second employer. 119 N.M. at 23, 888 P.2d at 469. The Court of Appeals in *McMains* concluded that the second employer "has the primary responsibility for payment of future medical benefits," and noted that, under NMSA 1978, § 52–1–47(D) (1991), the second employer may be able to reduce its liability "to the extent that future medical expenses are necessary as a result of Worker's accident at [the initial employer]." *Id.* at 24, 888 P.2d at 470. We believe that this analysis is consistent with our discussion of the issue.

{17} In *Jouett*, the Court of Appeals distinguished *Salinas–Kendrick v. Mario Esparza Law Office*, 118 N.M. 164, 879 P.2d 796 (Ct.App.1994) from the present matter. *Jouett*, 2004–NMCA–023, ¶ 14, 135 N.M. 136, 85 P.3d 260. *Salinas–Kendrick* held that, where the initial accident occurred over a year before disability, the insurer who covered the employee at the time she became disabled, rather than the insurer who covered the employee when she was initially

accidentally injured, is liable for medical and compensation benefits. 118 N.M. at 165–66, 879 P.2d at 797–98. In *Jouett*, the Court of Appeals stated that "there was no medical testimony in *Salinas–Kendrick* that the initial accident was causally connected to the subsequent need for medical treatment or to the subsequent disability." *Jouett*, 2004–NMCA–023, ¶ 14, 135 N.M. 136, 85 P.3d 260. The Court of Appeals then concluded that the case was thus inapplicable to Jouett's situation. *Id.* However, in *Salinas–Kendrick*, the worker suffered an initial accident in 1990; she continued to work with some pain, and, in 1991, she could no longer tolerate the pain and became disabled from aggravation of the initial injury. *Salinas–Kendrick*, 118 N.M. at 165, 879 P.2d at 797 ("Although Claimant suffered an accident in September 1990, she did not become disabled *from that accident* until December 1991.") (emphasis added). Thus, we determine that *Salinas–Kendrick*, as discussed further below, is directly applicable to the present matter. We conclude that *Salinas–Kendrick* does not support the determination that Growney Equipment, as the employer at the time of the initial injury but not the later disability, is initially responsible for the payment of disability benefits where there is evidence that Jouett's continued work-related activities have contributed to his 2001 disability.

{18} In its adoption of a contribution theory, the Court of Appeals addressed whether Growney Equipment would be liable "for the entire cost [of] medical treatment, temporary total disability, and related benefits" if further medical tests demonstrate that Jouett's current condition is causally connected to his work with subsequent employers. *Jouett*, 2004–NMCA–023, ¶ 18, 135 N.M. 136, 85 P.3d 260. The Court noted that Section 52–1–47(D) allows a subsequent employer to reduce its payments to avoid overlap of an initial employer's payments, but found no similar statutory provision for the initial employer. *Jouett*, 2004–NMCA–023, ¶ 18, 135 N.M. 136, 85 P.3d 260. The Court described the apportionment between the employers as an equitable remedy when two successive injuries combine to produce the final disability and stated that "the successive employers

and their insurers are each required to contribute their proportionate share of the total responsibility for benefits when those benefits are awarded on the basis of a single rating of disability resulting from more than one compensable injury." *Id.* ¶ 19. The Court explained that its decision was based on the notion of alleviating the harsh result on the initial employer, Growney Equipment, "when subsequent injuries may have combined to produce a single disability." *Id.* The Court of Appeals determined that its conclusion was consistent with other provisions of the Workers' Compensation Act, including Section 52–1–47(D), as well as New Mexico's public policy as exemplified by our adoption of comparative negligence. *Id.* ¶ 20. The Court of Appeals concluded that because the contribution claim is "completely separate from" the compensation claim, the contribution claim is "not subject to the notice requirements and statute of limitations applicable to a worker's claim;" instead, as "a third-party action brought by an employer against other employers that may be deemed liable for contribution, the general statute of limitations for contribution actions shall apply." *Id.*

{19} We find no authority for the conclusion that, where a non-disabling work-related accidental injury is aggravated by subsequent employment, the first employer is initially wholly liable for medical and disability benefits resulting from the later disability. There is also no support for contribution by successive employers based on theories outside of workers' compensation law because the Workers' Compensation Act is the exclusive remedy for work-related injuries.

{20} We agree with the Court of Appeals' observation that Section 52–1–47(D) authorizes only subsequent employers to reduce its payments and thus "is of no assistance to First Employer," as well as its recognition that "there is no similar provision giving relief where the First Employer is held initially responsible." *Jouett*, 2004–NMCA–023, ¶ 18, 135 N.M. 136, 85 P.3d 260. However, we believe that the fact that the Legislature has only provided for subsequent, or current, employers to apportion payment, not previous employers, is particu-

larly significant in answering the preliminary question of which employer has initial liability to the employee for a disabling work injury. We agree with the Court of Appeals that "[t]he principle behind apportionment is to treat the employers and their insurance companies equitably when two successive injuries combine to produce the final disability." *Id.* ¶ 19. However, we conclude it is impractical to hold the first employer liable for disability that arises following subsequent work-related aggravation of an initial non-disabling injury. Growney Equipment argues that, under the *Jouett* opinion, because the first employer is presumptively liable where there were subsequent work injuries or aggravations, the first employer is burdened to attempt "to track Worker's subsequent employment history and accidents, even if it is years after any accidents with First Employer." We also note that this scheme would frustrate the purposes of the notice provision. Consistent with New Mexico law and from a practical standpoint, we conclude that the employer at the time of the disability is responsible for compensation for preexisting non-disabling injuries aggravated by subsequent work activities.

### B. Worker's Compensation Liability

{21} "[T]he question of apportionment ordinarily arises only after the determination of initial liability is made." *Garcia,* 112 N.M. at 600, 817 P.2d at 1242. Thus, we first determine, as a preliminary matter, which employer has potential liability for Jouett's 2001 disability.

{22} "The right to the compensation provided for in [the Act], in lieu of any other liability whatsoever, ... shall obtain in all cases where ... *at the time of the accident,* the employee is performing service arising out of and in the course of [the worker's] employment," and the injury or death is "proximately caused by [an] accident arising out of and in the course of [the worker's] employment." NMSA 1978, § 52-1-9 (1973) (emphasis added). 'Claims for workers' compensation shall be allowed only ... when the accident was reasonably incident to [the worker's] employment ... and ... when the disability is a natural and direct result of the accident." NMSA 1978, § 52-1-28(A) (1987). Thus, Jouett is entitled to compensation for a work-related injury from the employer at the time of the accident. For purposes of defining an accident with regard to a disability, "[c]ompensation is paid only when a work-related accidental injury becomes disabling." *Salinas–Kendrick,* 118 N.M. at 166, 879 P.2d at 798.

{23} It is undisputed that Jouett suffered a compensable, work-related accident while employed with Growney Equipment in January of 1999, meeting the requirements of Section 52-1-9. However, Growney Equipment satisfied its obligation for Jouett's 1999 accidental injury at that time by providing medical treatment; because he was not disabled in 1999, Jouett was not entitled to a disability claim under Section 52-1-28 at that time.[1] The WCJ found that Jouett aggravated his initial injury sustained during his employment with Growney Equipment while working for his subsequent employers, Patterson Drilling and Big Dog. We therefore must determine which employer is potentially liable for Jouett's 2001 disability, based on the fact that Jouett aggravated his initial injury sustained at Growney Equipment during his employment with Patterson Drilling and Big Dog, eventually becoming disabled while in the employ of Big Dog.

{24} *Salinas–Kendrick* addressed a situation in which the worker suffered a work-related accident, continued to work for the same employer, but became disabled due to aggravation of the earlier accident over a year later. 118 N.M. at 165, 879 P.2d at 797. "[W]here there is evidence that [the worker's] continued work-related activities have contributed to [the worker's] disability, the insurance company insuring Employer at the time of the disability is responsible for payment of the disability benefits." *Id.* "[D]isability arising from an accident is the event that triggers the obligation

---

**1.** Whether Jouett is currently entitled to medical benefits attributable to his 1999 injury from Growney Equipment is discussed below.

for payment." *Id.* at 165–66, 879 P.2d at 797–98. "[T]he date that the injury became compensable due to further work-related causes is the determinative factor." *Id.* at 166, 879 P.2d at 798. " 'When a disability develops gradually, or when it comes as the result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation.' " *Id.* (quoted authority omitted).

{25} In *Gonzales v. Stanke–Brown & Associates, Inc.,* 98 N.M. 379, 381, 648 P.2d 1192, 1194 (Ct.App.1982), the Court of Appeals addressed a situation in which the worker suffered successive compensable disabilities where there were successive compensation insurers but a single employer. "Compensation is paid, under New Mexico law, for disability. For an accidental injury to be compensable, the disability must be a natural and direct result of the accident and where such a result is denied, causation must be established as a medical probability by expert medical testimony." *Id.* at 382, 648 P.2d at 1195 (citation omitted). In *Stanke–Brown,* the worker had a preexisting condition caused by an initial accident, that had resulted in a forty-five percent permanent partial disability, when a second accident occurred, resulting in injury and an additional ten percent permanent partial disability. *Id.* at 381, 648 P.2d at 1194. The Court of Appeals concluded that, under New Mexico law, "disability resulting from the second accident, regardless of the pre-existing condition, is compensable by the employer and compensation insurer at the time of the second accident." *Id.* at 383, 648 P.2d at 1196. The Court relied on an opinion from this Court which held that

> where there is a direct relationship or causal connection between the accidental injury and the resulting disability the employee is entitled to compensation to the full extent of the disability even though attributable in part to a pre-existing condition, notwithstanding acceleration or aggravation may be absent. It must be clear that there must be some causal connection. . . .

*Reynolds v. Ruidoso Racing Ass'n, Inc.,* 69 N.M. 248, 258, 365 P.2d 671, 678 (1961). "A causal connection between work done and an injury is insufficient; an accident is required. Unless an accidental injury resulting in disability occurred during the time the second compensation carrier insured the employer, the second carrier had no compensation liability." *Stanke–Brown,* 98 N.M. at 384, 648 P.2d at 1197.

{26} The Court of Appeals concluded that "[t]he employer and compensation carrier at the time of the first accidental injury remain liable for compensation benefits payable for disability resulting therefrom." *Id.* at 386, 648 P.2d at 1199. However, the worker's preexisting condition in *Stanke–Brown* was a work-related accidental injury that resulted in disability prior to the successive work injury. *Id.* at 383, 648 P.2d at 1196. *Stanke–Brown* was addressing "[t]he problem [of] whether *a prior employer, liable for disability* from an accidental injury, *is relieved* of liability by a subsequent accidental injury causing disability." *Id.* at 384, 648 P.2d at 1197 (emphasis added). By contrast, in the present matter, Jouett suffered a work-related injury but no disability at the time of his initial accident. Thus, the question for this Court is not whether Growney Equipment, the employer "at the time of the first accidental injury[,] *remain[s]* liable for compensation benefits payable for disability resulting therefrom." *Id.* at 386, 648 P.2d at 1199 (emphasis added). Rather, the question is which employer is liable when the worker suffered an initial non-disabling injury, aggravated the injury through later employment, and became disabled while working for a successive employer. "The employer and compensation carrier at the time of the second accidental injury are initially liable for disability resulting from the second accidental injury, to the full extent of the disability." *Id.* As discussed further below, this liability on the part of the successive employer may be reduced under Section 52–1–47(D) if the initial injury resulted in disability prior to the subsequent injury. *See id.*

{27} Thus, under both *Salinas–Kendrick* and *Stanke–Brown,* Big Dog is poten-

tially responsible for Jouett's disability claim because disability resulting from the subsequent accident, regardless of the preexisting condition, that is, Jouett's initial 1999 injury, is compensable by the employer and compensation insurer at the time of the subsequent accident. It is undisputed that Jouett suffered a work-related accident while employed with Growney Equipment. It is also undisputed that Jouett was not disabled at the time of his initial injury. Perhaps the confusion in this case is partially the result of whether or not Jouett suffered an "accidental injury" resulting in his 2001 disability while working for Patterson Drilling or Big Dog. The WCJ found that Jouett suffered work-related accidents that resulted in injury while working for his subsequent employers, Patterson Drilling and Big Dog. Further, our precedent does not require a discrete "accident," in the traditional sense, if employment activity itself aggravates a preexisting injury and results in disability, which is also consistent with the WCJ's finding that Jouett's work with Patterson Drilling and Big Dog aggravated his initial shoulder injury.

{28} The Court of Appeals, in an earlier case, described the rule in New Mexico for what constitutes an accident: "[I]f the stress of labor aggravates or accelerates the development of a preexisting infirmity causing an internal breakdown of that part of the structure, a personal injury by accident does occur." *Herndon v. Albuquerque Pub. Sch.*, 92 N.M. 635, 640, 593 P.2d 470, 475 (Ct.App. 1978). In *Herndon*, the worker had a preexisting back condition caused by non-industrial accidents. *Id.* at 637, 593 P.2d at 472. The worker suffered an employment-related accident resulting in severe back pain in June; she continued to work for several weeks before becoming disabled in September as a result of the severe pain. *Id.* at 637–38, 593 P.2d at 472–73. The Court of Appeals summarized that a worker has suffered an accidental injury if he or she has preexisting pain from a previous work-related accident, continues "normal employment under pain," and subsequently suffers a disability that was "caused or accelerated while working." *Id.,* at 640, 593 P.2d at 475. "[A] malfunction of the body itself ... caused or accelerated by doing work required or ex-

pected in employment is an accidental injury within the meaning and intent of the compensation act." *Id.* (emphasis omitted) (quoted authority omitted). Under these circumstances, where a work-related accidental injury is aggravated by continued employment activities but the worker continues normal employment under pain resulting in later disability, the Court concluded that the time and place of the "accident," for purposes of "definiteness and certainty" of the Act, is the date the worker became disabled. *Id.* at 639, 642, 593 P.2d at 474, 477.

{29} Jouett's aggravation of his 1999 non-disabling injury through his employment duties at Patterson Drilling and Big Dog, where he performed his work, albeit in pain, resulting in his 2001 disability, thus constitutes an "accidental injury" within the meaning and intent of the Workers' Compensation Act regardless of whether Jouett had other discrete work-related accidents while employed with Patterson Drilling and Big Dog. *See Herndon,* 92 N.M. at 640, 593 P.2d at 475 ("The 'accident' was the subsequent and continued strain on plaintiff's back that resulted in an accidental injury on September 2, 1975 [when she terminated her employment because of disability due to severe pain]."). Despite any pain he may have suffered due to accidents or aggravation of his injury, Jouett did not become disabled during the two weeks he worked for Patterson Drilling, so this employer is not liable for disability compensation. Big Dog is potentially responsible for Jouett's 2001 disability claim because it was his employer at the time of the second accident or aggravation of his injury resulting in disability, if Jouett complied with other requirements of the Act. *See Salinas–Kendrick,* 118 N.M. at 166, 879 P.2d at 798, *Stanke–Brown,* 98 N.M. at 383, 648 P.2d at 1196.

{30} The WCJ did not determine a date of disability for Jouett. The WCJ may have decided that a specific determination was unnecessary because, under the facts of this case, Jouett became disabled in 2001 while employed by Big Dog, either in May, when he was told by Dr. Maldonado that he was temporarily totally disabled and

should not continue his work with Big Dog, or as of December 14, 2001, when he quit work with Big Dog because he could no longer perform his duties due to his injury. We do not fault the WCJ; we agree with the WCJ that this is a complex case, both factually and substantively, as also demonstrated by the efforts of the Court of Appeals. However, we believe that the date of disability is an ultimate fact necessary for a determination of liability. *See Torres v. Plastech Corp.*, 1997–NMSC–053, ¶ 13, 124 N.M. 197, 947 P.2d 154. "Conclusions of law must be supported by findings of ultimate fact." *Id.* We assume that Jouett became disabled as of December 14, 2001. This fact appears to be consistent with both the record and the definition of temporary total disability as "the inability of the worker, by reason of accidental injury arising out of and in the course of [the worker's] employment, to perform [the worker's] duties prior to the date of [the worker's] maximum medical improvement." NMSA 1978, § 52–1–25.1(A) (1991). Although the medical expert may not have been able to give an opinion as to what percentage of Jouett's disability was the result of work performed at Growney Equipment, Patterson Drilling, and Big Dog, it appears that Jouett became disabled as of December 14, 2001, when he could no longer perform his employment duties. For purposes of this analysis, December 14, 2001, is therefore the operative date for determining liability for Jouett's disability compensation. We recognize that there continues to be argument by some of the employers that Jouett became disabled earlier. Notwithstanding our assumption, on remand we direct the WCJ to determine the date of disability and consider arguments contrary to our assumption.

## C. Notice

■ {31} The date of disability is an ultimate fact necessary to determine not only liability for compensation, but also notice. *See Torres*, 1997–NMSC–053, ¶ 13, 124 N.M. 197, 947 P.2d 154. The WCJ decided that Jouett failed to give written or actual notice to Big Dog and to Patterson Drilling, which barred Jouett's recovery for disability compensation from these employers. With re-

gard to Big Dog, in his notice of proposed decision, the WCJ indicated that he based this decision on the fact that Mike Whitley, Big Dog's safety representative, testified that Jouett had never mentioned any accident, that a second Big Dog employee had testified that there was no notice of injury made to the company, and that Jouett, although responsible for preparing drilling well logs, did not report an accidental injury to his shoulder on these logs. Based on this explanation, the WCJ appeared to believe that Jouett was required to give notice to Big Dog fifteen days after a specific "accident," rather than the date of Jouett's disability. From a review of the record, and due to Jouett's emphasis on the 1999 accidental injury, it appears that the parties also measured the notice requirement from the date of the initial accident or the subsequent discrete accidents at Patterson Drilling or Big Dog described somewhat inconsistently by Jouett. However, in a case such as the present one, where aggravation of a prior injury results in disability, notice must be measured from the date of disability, as discussed further below.

{32} NMSA 1978, § 52–1–29(A) (1991) provides that workers "shall give notice in writing to [their] employer of the accident within fifteen days after the worker knew, or should have known, of its occurrence." This provision required that Jouett give notice in writing to Big Dog of the accident within fifteen days after he knew, or should have known, of its occurrence. "No written notice is required to be given where the employer or any superintendent or foreman or other agent in charge of the work in connection with which the accident occurred had actual knowledge of its occurrence." Section 52–1–29(A). Thus, if Big Dog or an agent in charge of the work had actual knowledge of Jouett's accidental injury, Jouett is not required to give written notice. The statute of limitations requires Jouett to file a claim within one year after an employer fails or refuses to pay him compensation. *See* NMSA 1978, § 52–1–31(A) (1987).

{33} Big Dog argues that Jouett failed to give notice, contending that Jouett was required to do so when his injury was aggravated by his work duties, on his daily tour

sheets, when he sought medical treatment for his shoulder in April of 2001, and when he had accidental injuries chipping paint, pulling drill collars, or tripping pipe. Big Dog further argues that Jouett knew that, in Dr. Maldonado's opinion, he was temporarily totally disabled in May of 2001, when he briefly stopped working for Big Dog in order to seek treatment for his shoulder. We note that Big Dog, in its discussion of the Court of Appeals' holding that the WCJ's findings and conclusions were to be vacated as premature because the extent of the injury to Jouett's shoulder had not been ascertained, correctly argues that disability triggers liability for compensation and recognizes that Jouett claimed that he could no longer perform his duties due to disability on December 14, 2001. However, Big Dog continues to argue that Jouett was required to give notice, not as measured from December 14, 2001, but from the date of alleged work accidents and the dates when Jouett sought medical care. The date of disability, as determined by the WCJ on remand, will also determine the date from which notice is to be measured.

■ {34} Establishing the date of the "accident" "is essential to determine whether the employer had written notice or actual knowledge" pursuant to Section 52–1–29(A). *Herndon*, 92 N.M. at 639, 593 P.2d at 474. In *Herndon*, the Court of Appeals addressed notice in the context of a work-related accident that later became disabling due to employment activities where the worker did not give written notice of the injury-producing event within the statutory time period. *Id.* at 638–39, 593 P.2d at 473–74. The Court measured the date of the worker's accident not as the date of the initial accident but from the date the accidental injury became disabling. *Id.* at 642, 593 P.2d at 477. An employment report prepared by her supervisor for purposes of workers' compensation indicated that the worker was injured in June and noted that she continued to work, except for a vacation, for several weeks until September. *Id.* The employer argued that it had no actual knowledge of an accident for purposes of the Workers' Compensation Act but only knowledge that the worker's back was hurting her. *Id.* The *Herndon* Court concluded that the worker gave actual notice

based on the report and the supervisor's "previous knowledge of [her] work and the pressure brought to bear upon the aggravation of her back injury." *Id.* Particularly relevant to the present case, the Court,

> [i]n determining whether [the employer] had actual knowledge of the accident, ... [gave] no credence to [the supervisor's] testimony as to the meaning of an "accident," nor to [the worker's] statement that the "accident" occurred on June 4, 1975. It is obvious that the employer and claimant have no understanding of what may constitute an "accident" in a workmen's compensation claim. The average person believes that an accident occurs, by way of illustration, where a claimant suffers a cut finger or smashed thumb. Neither of the parties knew or understood the meaning of an "accident" as described [by precedent]. Our duty is to glean from the evidence presented, the "accident" that occurred and the date thereof.

*Id.* The Court thus concluded that, for purposes of notice, it did "not fix the date of [the worker's] accident as June 4, 1975;" instead, "[t]he 'accident' was the subsequent and continued strain on [the worker's] back that resulted in an accidental injury on September 2, 1975," when the injury became disabling. *Id.*

{35} In the present matter, as with *Herndon*, the date Jouett became disabled is the operative date of accidental injury for purposes of notice, so Jouett was required to give notice to Big Dog within fifteen days after his disability prevented him from working. Also as with *Herndon*, it is not relevant how the worker or employer might define an "accident." Jouett's somewhat conflicting testimony that he may or may not have suffered discrete accidental injuries while working for Patterson Drilling and Big Dog is less relevant than the fact that he testified that his work activities at these subsequent employers aggravated his initial injury, supported by Dr. Maldonado's expert testimony. This work-activity-induced aggravation of his shoulder resulting in disability constituted the "accident" for which he is required to give notice. However, December 14, 2001, is the latest date that Jouett could argue that

he became disabled and could no longer perform his work duties; thus, he knew or should have known, by that date at the very least, that he had suffered a compensable injury for which notice is required.

{36} This Court discussed the notice requirement in *Gomez v. B.E. Harvey Gin Corp.*, 110 N.M. 100, 792 P.2d 1143 (1990). In *Gomez*, the worker injured his lower back on December 14, 1988, in a work-related accident; he suffered immediate pain but continued to work for the day, receiving medical treatment that evening. *Id.* at 101, 792 P.2d at 1144. He remained home the following day due to pain from this injury, "but thereafter worked in continual pain at his regular job until January 27, 1989," eventually going to the hospital on February 3 due to severe pain. *Id.* at 102, 792 P.2d at 1145. He gave notice of an accidental injury to his employer on January 31. *Id.* The hearing officer barred the claim because of his failure to provide timely notice to his employer of the December 14 accident. *Id.* This Court noted that "[t]he time for giving notice begins to run when the employee knows, or should know by the exercise of reasonable diligence, that [the worker] has sustained a compensable injury." *Id.* We recognized that "[t]his rule concerns the worker's knowledge of some legal disability or inability to perform work." *Id.* Although we noted that actual disability is not required, the worker must be "impaired and unable, at least to some percentage extent, to perform the job for which the worker is suited. The period for written notice does not begin to run until the claimant is charged with such knowledge." *Id.* (citation omitted). "[T]his recognition may become apparent to a worker [such as Jouett] only after loss of the capability to perform regular duties, notwithstanding the fact that some time has elapsed from the date of the original incident during which the worker was able to perform usual tasks while experiencing pain." *Id.*

{37} In the present matter, although Jouett was told in May of 2001 that he had a compensable disability and should not continue working, Jouett apparently managed to continue to perform the usual tasks required at Big Dog for approximately six more months before he was no longer able to work due to aggravation of his injury, resulting in disability. *See Martinez v. Darby Constr. Co.*, 109 N.M. 146, 150, 782 P.2d 904, 908 (1989) (discussing a worker who failed to give notice regarding an accidental neck injury, despite advised medical treatment, but gave notice following disability, six months later, and concluding that, where "the evidence concerning his ability to perform his regular duties, albeit in pain, indicates that no special accommodations were made for the claimant" and he did not do less work or work fewer hours, the worker's belief was "within the bounds of reason"). Although the workers in *Gomez* and *Martinez* were not advised, as Jouett was in May of 2001, that they were temporarily disabled before they continued to work, Big Dog, involved in Jouett's claim by September of 2001, appears to have had much more information regarding his condition while he continued as an employee than the employers in those cases.

{38} Big Dog bases its arguments on a failure to give notice while Jouett was continuing his employment with Big Dog rather than the date of disability. However, the date of disability is the operative date with regard to notice. Big Dog argues that Jouett knew or should have known of his disability by May 15, 2001, when Jouett sought medical treatment for his shoulder and Dr. Maldonado told him that he should not return to work because he was temporarily totally disabled. We agree that it was, from a health standpoint, clearly a mistake for Jouett to continue working with his self-described severe pain and muscle atrophy. However, Jouett, despite the pain he describes as extreme, was apparently able to continue to perform the requirements of heavy labor on drill rigs for Key Drilling and Big Dog for several months to the presumed satisfaction of these employers. Big Dog rehired Jouett in the summer of 2001, and Jouett continued to work in his normal job until December of 2001 when he claimed he could no longer work due to disability.[2] De-

2. There are allegations that Jouett failed to disclose his preexisting condition on employment

applications. *See* NMSA 1978, § 52–1–28.3(A) (1991) (providing that "[w]hen an employer asks

spite Big Dog's awareness of Jouett's initial shoulder injury and his ongoing claim against all three employers, including Big Dog, during this time, Jouett evidently continued to work for Big Dog performing his strenuous duties. Nothing in this discussion, however, should be viewed as preventing the parties, following remand, from arguing that Jouett was not performing his duties as required during his last few months at work for Big Dog.

{39} These arguments, concerning whether Jouett gave adequate notice based on the date of disability as determined by the WCJ, must be resolved on remand following application of the appropriate legal precedent as discussed in this opinion. We remand this case to the WCJ to determine whether Big Dog received written or actual notice of Jouett's accident from the date of disability. *See Chavez v. S.E.D. Labs.,* 2000–NMSC–034, ¶ 22, 129 N.M. 794, 14 P.3d 532 ("We believe that when a determination is unsupported, justice requires a remand for entry of proper findings and conclusions.").

**D. Contribution**

■ {40} Big Dog argues that the Court of Appeals' contribution holding subjects employers to two sets of claims, one from workers who must comply with notice and statute of limitations provisions and the second from previous employers where these provisions would be inapplicable. Patterson Drilling distinguishes between contribution and apportionment; it argues that contribution is a statutory obligation on one joint tortfeasor to contribute that tortfeasor's share to the dis-

charge of common liability. *See* NMSA 1978, § 41–3–1 (1947) (defining joint tortfeasors). Patterson Drilling argues that the Court of Appeals erred by injecting contribution, as a fault or negligence principle, into workers' compensation, an explicitly no-fault system. Patterson Drilling also argues that the WCJ is not authorized to hear, consider, or rule on a contribution claim between employers which could result in parallel proceedings in state or federal district court for the same case. We agree that Big Dog and Patterson Drilling raise valid concerns regarding the Court of Appeals' opinion.

{41} Both Patterson Drilling and Big Dog argue that the Court of Appeals' contribution remedy contravenes the exclusive remedy provisions of the Workers' Compensation Act. We agree. NMSA 1978, § 52–1–6(D) (1992) provides that

> compliance with the provisions of the Workers' Compensation Act, ... shall be ... a surrender by the employer and the workers of their rights to any other method, form or amount of compensation or determination thereof or to any cause of action at law, suit in equity or statutory or common-law right to remedy or proceeding whatever for or on account of personal injuries or death of the worker than as provided in the Workers' Compensation Act and shall be an acceptance of all of the provisions of the Workers' Compensation Act and shall bind the worker ..., as well as the employer....

"The Workers' Compensation Act provides exclusive remedies." Section 52–1–6(E).

---

by written questionnaire for the disclosure of a worker's medical condition, no compensation is payable from that employer for an injury to that worker ... if ... the worker knowingly and willfully concealed information or made a false representation of his [or her] medical condition"). We first emphasize that it is not only required by statute but also in the worker's best interest to disclose preexisting conditions so as not to further aggravate injuries to the point of disability. Secondly, we note that Section 52–1–28.3 requires that the employer "was not aware of the concealed information that, if known, would have been a substantial factor in the initial *or continued* employment of the worker" or the employer "relied upon the false representation, and this reliance was a substantial factor in the

initial *or continued* employment of the worker." (Emphasis added.) We note that of relevance to this issue, Big Dog continued to employ Jouett for several months after learning of his medical condition without apparent work restrictions related to his shoulder. This defense also does "not apply unless, in the written questionnaire, the employer clearly and conspicuously discloses that the worker shall be entitled to no future compensation benefits if [the worker] knowingly and willfully conceals or makes a false representation about the information requested." Section 52–1–28.3(B). *See generally Pena v. Phelps Dodge Chino Mines,* 119 N.M. 735, 737–38, 895 P.2d 257, 259–60 (Ct.App.1995). We leave the ultimate resolution of this issue to the WCJ on remand.

NMSA 1978, § 52–1–8 (1989) provides that employers who have complied with the Act

shall not be subject to any other liability whatsoever for the death of or personal injury to any employee, except as provided in the Workers' Compensation Act, and all causes of action, actions at law, suits in equity, and proceedings whatever, and all statutory and common-law rights and remedies for and on account of such death of, or personal injury to, any such employee and accruing to any and all persons whomsoever, are hereby abolished except as provided in the Workers' Compensation Act.

The Court of Appeals' contribution analysis, in which an initial employer may seek contribution from subsequent employers, and the Court's conclusion that contribution was outside the Workers' Compensation Act, is in direct conflict with these provisions.

### E. Apportionment Under Section 52–1–47(D)

{42} The Workers' Compensation Act does not provide for contribution by different employers or insurers for disability or medical benefits. However, the Act does contain a provision regarding the reduction of benefits that would duplicate previous benefits. Section 52–1–47(D) provides that

the compensation benefits payable by reason of disability caused by accidental injury shall be reduced by the compensation benefits paid or payable on account of any prior injury suffered by the worker if compensation benefits in both instances are for injury to the same member or function or different parts of the same member or function or for disfigurement and if the compensation benefits payable on account of the subsequent injury would, in whole or in part, duplicate the benefits paid or payable on account of such prior injury.

"Section 52–1–47(D) 'is not merely a device for preventing a double recovery. It is an affirmative allocation of the burden in a successive injuries situation.'" *Garcia*, 112 N.M. at 603, 817 P.2d at 1245 (quoted authority omitted).

{43} We note that this section does not limit its application in terms of employers; thus, it is presumably applicable to a single employer or insurer, as well as subsequent employers and subsequent insurers. Stated another way, an employer could reduce compensation payments for a current disability if that employer previously paid disability to the employee for injury to the same member if the compensation would otherwise duplicate the benefits the employer paid on account of the prior injury. Section 52–1–47(D) authorizes a reduction in benefits paid by the current employer or insurer only when previous "compensation benefits paid or payable on account of any prior injury" "would, in whole or in part, duplicate the benefits paid or payable on account of such prior injury." As discussed below, based on Section 52–1–47(D) as well as New Mexico precedent, a reduction of payments for the current employer, initially responsible for all disability compensation to a worker disabled by a work-related injury in compliance with requirements of the Act, is authorized only where the worker has suffered a prior work-related accident for which the initial employer or insurer paid or must pay on account of the prior injury. Thus, Section 52–1–47(D) is operative where an employer or insurer has paid or must pay a worker for medical benefits or disability compensation for a prior accidental injury when the worker has suffered an aggravation or later injury to the "same member or function" and "the compensation benefits payable on account of the subsequent injury would, in whole or in part, duplicate the benefits paid or payable on account of such prior injury." We believe that this interpretation of Section 52–1–47(D) is consistent with the plain language of the statute, legislative intent, and our precedent.

{44} In *Stanke–Brown*, the Court of Appeals discussed a hypothetical situation in which a worker "suffers an accidental injury resulting in a 50 percent partial disability and compensation benefits are paid on the basis of that disability" and then the worker suffers "[a] subsequent accidental injury [that] results in a 100 percent disability" where "[t]he subsequent accidental injury aggravated the pre-existing condition and caused disability." 98 N.M. at 386, 648 P.2d at 1199. The Court noted that, under *Reynolds*, "the employer and compensation carrier

for the subsequent accident are liable for the 100 percent disability," but that because it was not an issue in *Reynolds,* that case did not address "what happened to the liability of the employer and compensation carrier for the pre-existing 50 percent disability." *Id.* The Court of Appeals then discussed the applicability of Section 52–1–47(D) and concluded that

> [t]he employer and compensation carrier at the time of the first accidental injury remain liable for compensation benefits payable for disability resulting therefrom. The employer and compensation carrier at the time of the second accidental injury are initially liable for disability resulting from the second accidental injury, to the full extent of the disability. Liability for disability resulting from the second accidental injury is reduced to the extent of benefits paid or payable for disability resulting from the first accidental injury if the requirements of [Section] 52–1–47(D) are met.

*Id.* " '[B]enefits for the subsequent injury may not duplicate benefits paid or payable for the prior injury. It is the overlap in benefits to which the reduction applies.' " *Id.* at 387, 648 P.2d at 1200 (quoted authority omitted, alteration in original). Thus, *Stanke–Brown's* analysis applies when there is disability and compensation paid or payable for that disability for an initial injury.

▮▮▮▮ {45} Although involving the later repealed Subsequent Injury Act, the Court of Appeals instructively discussed *Stanke–Brown* and Section 52–1–47(D) in *Lea County Good Samaritan Village v. Wojcik,* 108 N.M. 76, 766 P.2d 920 (Ct.App.1988). Based on *Stanke–Brown* and Section 52–1–47(D), "if an employee has previously sustained a compensable injury under the Workers' Compensation Act *and has been awarded benefits* and thereafter suffers a subsequent injury involving the same members or functions, ... the employer at the time of the second accident ... [is not] liable for any impairment *for which the worker has already been compensated.*" *Wojcik,* 108 N.M. at 81, 766 P.2d at 925 (emphasis added). Thus, Section 52–1–47(D) operates only where the worker received benefits for the initial injury and

subsequently suffers a work-related injury to the same member or function and benefits for the subsequent injury would duplicate benefits paid or payable for the initial injury.

{46} Under *Stanke–Brown,* the employer at the time of the second or subsequent accidental injury is initially liable for the "full extent of the disability," and then the current employer's liability is "reduced to the extent of benefits paid or payable for disability resulting from the first accidental injury." 98 N.M. at 386, 648 P.2d at 1199. Applying Section 52–1–47(D) and the analysis of *Stanke–Brown* to the present matter, Big Dog and its insurer, as the employer and compensation carrier at the time of the subsequent accidental injury resulting in disability, are initially potentially liable for disability resulting from the subsequent accidental injury, to the full extent of the disability. Big Dog's potential liability for Jouett's disability can be reduced under Section 52–1–47(D) only to the extent of disability benefits paid or payable by Growney Equipment or Patterson Drilling resulting from the first or prior accidental injuries.

{47} In order for Growney Equipment or Patterson Drilling to be liable for any portion of disability compensation or medical benefits under Section 52–1–47(D), in addition to any other requirements with the Workers' Compensation Act, these employers must be responsible for "compensation benefits paid or payable on account of any prior injury suffered by the worker." Jouett must have previously complied with all requirements of the Act and received medical or disability benefits paid or payable by Growney Equipment or Patterson Drilling for his prior injury for which current benefits would be duplicative.

▮▮▮ {48} Patterson Drilling argues that it is not responsible for either medical benefits or disability compensation by operation of the notice statute as well as the statute of limitations. Patterson Drilling recognizes that *Stanke–Brown* held that the worker's employer at the time the injury becomes disabling is responsible for compensation benefits related to the disability, and notes that the employer can then seek apportionment under Section 52–1–47 to reduce bene-

fits proportionally to the extent of any benefits payable from a prior disability or preexisting injury. Patterson Drilling asserts that under New Mexico case law and the undisputed facts of the present case, Big Dog is solely responsible for payment of disability benefits to Jouett because Jouett continued to work after his initial January 1999 accident with Growney Equipment and the injury did not become disabling until December of 2001. We agree that Patterson Drilling is not liable for disability or medical benefits. Because Jouett did not make any claim for disability or medical benefits while working at Patterson Drilling, there is no injury for which Patterson Drilling is responsible for benefits paid or payable that would duplicate the medical or disability payments potentially owed by Big Dog. Had Jouett given proper notice and filed a successful claim against Patterson Drilling within the statute of limitations for medical or disability benefits suffered while he was an employee, Big Dog could reduce its liability by any duplicative benefits. Because Jouett did not give notice or file a claim while working for Patterson Drilling for any work-related accidental injury or disability for his two weeks of employment, Patterson Drilling was not liable to Jouett while he was an employee for any compensation benefits paid or payable on account of any prior injury which would be duplicative of disability benefits theoretically owed by Big Dog for Jouett's 2001 disability. Thus, Big Dog would not be able to reduce its compensation payments to Jouett for his 2001 disability in relation to Patterson Drilling.

■ {49} Similarly, because Jouett's 1999 accidental injury did not result in disability, Growney Equipment was not liable to Jouett for disability compensation benefits that would be duplicative of disability benefits theoretically owed by Big Dog. Again, Section 52–1–47(D) would not provide for Big Dog to reduce its compensation payments to Jouett for his 2001 disability in relation to Growney Equipment.

■ {50} Consistent with our interpretation of Section 52–1–47(D), our precedent supports the conclusion that prior employers and their insurers are not responsible for any portion of disability resulting from an aggravation of a prior injury or a subsequent injury to the same member or function if the initial accidental injury did not result in disability. The employer and its insurer at the time of the disability under such circumstances is wholly responsible. To illustrate this point, we compare those cases which apportioned disability compensation due to a prior injury resulting in disability with a case, similar to the present matter, where the initial injury did not result in disability. Although *Stanke–Brown* concluded that the employer and compensation carrier at the time of the first accidental injury remain liable for compensation benefits payable for disability resulting from the initial injury, 98 N.M. at 382, 648 P.2d at 1195, the initial injury in *Stanke–Brown* resulted in a permanent partial disability that existed prior to the successive injury and resulting disability, *id.* at 381, 648 P.2d at 1194. However, unlike *Stanke–Brown*, Jouett suffered an accidental injury in 1999 with no resulting disability. In *Garcia*, the worker received disability benefits and medical expenses for an initial accidental injury that resulted in disability prior to the second injury and resulting disability. 112 N.M. at 598, 817 P.2d at 1240. *Urioste* applied *Stanke–Brown's* holding that the employer at the time of the initial accidental injury remains liable to the worker for "compensation benefits payable to the extent of any disability resulting from the initial injury," 107 N.M. at 738, 764 P.2d at 509, but also addressed a situation in which the worker was temporarily totally disabled at the time of the initial accident. *Id.* at 736, 764 P.2d at 507. Again, in *McMains*, the Court of Appeals affirmed apportioning liability for disability compensation where the worker received disability benefits from the initial accidental injury. 119 N.M. at 23, 888 P.2d at 469. Unlike *Stanke–Brown, Garcia, Urioste,* and *McMains*, however, *Salinas–Kendrick* is factually identical to the present matter on this point.

{51} In *Salinas–Kendrick,* the worker suffered an accidental injury in 1990 that was not disabling; more than a year later, she became disabled because her initial inju-

ry was aggravated by continued work. 118 N.M. at 165, 879 P.2d at 797. The employer at the time of the disability is responsible for disability benefits where the evidence indicates that the worker's continued work-related activities contributed to his or her disability. *Id.* We conclude that Growney Equipment is not liable for Jouett's 2001 disability compensation because Jouett was not disabled as a result of his initial accidental injury; Jouett's continued work-related activities at his subsequent employers contributed to his disability, and Gowney Equipment was not the employer at the time Jouett became disabled. "The date of an accident that does not result in disability . . . is irrelevant. In this case, the date that the injury became compensable due to further work-related causes is the determinative factor." *Id.* at 166, 879 P.2d at 798. We see no way to meaningfully distinguish Jouett's case from *Salinas–Kendrick.* We note that *Salinas–Kendrick* did not discuss application of Section 52–1–47(D) despite the fact that the insurer at the time the disability arose argued that the injury was sustained while the worker was employed under an initial insurer. It is consistent to conclude that Section 52–1–47(D) would not apply in *Salinas–Kendrick* because the insurer at the time of the initial injury was not responsible for any disability payments to the worker at that time because her disability arose subsequently. Similarly, with regard to the present case, Section 52–1–47(D) does not apply to Growney Equipment for Jouett's disability benefits because he was not disabled by his 1999 injury and his disability arose later.

{52} Regarding medical benefits, we begin by noting that NMSA 1978, § 52–1–49(A) (1991) provides that employers must provide necessary health care services "as long as medical or related treatment is reasonably necessary." *See Wojcik,* 108 N.M. at 82, 766 P.2d at 926 ("A party seeking recovery of medical expenses in a worker's compensation proceeding has the burden of proving that the expenses were reasonably necessary and directly related to the worker's disability. Similarly, a party seeking payment or reimbursement of medical expenses carries the burden of proof on this issue.") (citation omitted). Growney Equip-

ment was responsible for and paid medical benefits for Jouett's prior 1999 shoulder injury. Our precedent has held that Section 52–1–47(D) applies to medical benefits as well as disability compensation. *Brewster v. Cooley & Assocs.,* 116 N.M. 681, 686, 866 P.2d 409, 414 (Ct.App.1993) (concluding that, despite the plain language of Section 52–1–47(D) applying to "compensation benefits payable by reason of disability," the Section applies to medical benefits); *McMains,* 119 N.M. at 24, 888 P.2d at 470 (concluding that the subsequent employer had "primary responsibility for payment of future medical benefits" and that the subsequent employer could reduce its liability based on Section 52–1–47(D)). Thus, Section 52–1–47(D) would authorize Big Dog, theoretically, to reduce medical benefits paid or payable on account of Jouett's prior 1999 shoulder injury by Growney Equipment if such benefits would, in part, duplicate the benefits paid by Growney Equipment. Although any current medical payments for Jouett's 2001 injury would not presumably duplicate the benefits paid by Growney Equipment in 1999, Growney Equipment may be responsible for some portion of Jouett's current medical benefits that would duplicate Big Dog's liability for Jouett's current medical benefits if causally connected to Jouett's 1999 injury. *See McMains,* 119 N.M. at 25, 888 P.2d at 471 ("If [the worker] incurred medical expenses relating to a work-related injury in the future, he [or she] would still have to prove them in order to recover.") (quoted authority omitted); *cf. Stanke–Brown,* 98 N.M. at 382, 648 P.2d at 1195 ("This causation requirement applies to *any* claim for worker's compensation; it makes no difference whether the claim is for a first, second or successive accidental injury."). On remand, the WCJ should consider whether, if it determines that Big Dog is liable for disability and medical benefits, Big Dog is entitled to reduce some portion of the medical expenses duplicative of medical expenses paid or payable by Growney Equipment.

### III. Conclusion

{53} In the present matter, the date of disability determines liability for compensa-

tion. Jouett's initial 1999 work-related injury did not become disabling until 2001, when he was employed by Big Dog. Under these circumstances, where a worker suffers a non-disabling initial injury and continued work-related activities contribute to the worker's subsequent disability, the employer and insurer at the time of the disability are responsible for payment of the disability benefits. Thus, we conclude that Jouett's employer at the time his injury became disabling, Big Dog, is potentially responsible for compensation benefits related to the disability. Liability for compensation resulting from the subsequent accidental injury may be reduced to the extent of benefits paid or payable for compensation resulting from the first accidental injury if the requirements of Section 52–1–47(D) are satisfied. Under Section 52–1–47(D), Big Dog would have the opportunity, if necessary, to reduce the benefits potentially owed Jouett based on any duplicative medical expenses owed by Growney Equipment. Because Jouett did not suffer a disability while employed by Patterson Drilling or give notice or file a claim against Patterson Drilling within the statute of limitations for any injury sustained at that time, Patterson Drilling is not responsible for any portion of Jouett's 2001 compensation claim. We thus affirm the WCJ on this point. Because Jouett's injury with Growney Equipment did not result in a disability at that time, Section 52–1–47 does not authorize Big Dog to reduce disability compensation from Growney Equipment. Because the WCJ did not determine the date of Jouett's disability, an ultimate fact essential for the WCJ's conclusions of law regarding liability and notice, we remand for this determination. Also based on this determination, we remand in order for the WCJ to consider whether Big Dog had written or actual notice of Jouett's accidental injury from the date of disability. On remand, the WCJ should also determine whether Growney Equipment is responsible for some portion of Jouett's medical expenses. Thus, we reverse the Court of Appeals' opinion, affirm the order of the WCJ in part, and remand for further proceedings consistent with this opinion.

{54} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PAMELA B. MINZNER, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.